GUIDRY, Judge.
In this suit, plaintiffs, Louis Bellard, Charles Bellard and Jude Bellard, seek to recover damages in the sum of $96,052.00, from Mowata Rice Drier, Inc. In support of their demand plaintiffs allege that the defendant, acting through its general manager, Paul Frey, mishandled the sale of their 1976 crop of soybeans resulting in a loss to plaintiffs in the sum sued for. The instant suit is consolidated with a companion matter entitled Carl Sloan v. Mowata Rice Drier, Inc., our docket number 8222, La.App., 400 So.2d 735, which is one filed by the owners of the land from which the crops were produced and harvested. In this latter suit the land owners seek to recover their proportionate part of the damages allegedly sustained. We this day render a separate opinion in that suit.
The salient facts, as gleaned from the record, are for the most part without dispute.
Mowata Rice Drier, Inc., hereafter Mowa-ta, is an old established firm which dries and stores rice and soybeans. As a necessary adjunct to its business Mowata handles the sale of rice and soybeans for the farmers doing business with them. Paul Frey, an employee of some 30 years, is Mowata’s general manager.
Paul Frey and Louis Bellard were long time friends having worked together as co-employees at Mowata for some twelve years. In addition to his employment at Mowata, Mr. Bellard farmed rice and soybeans and at his request Mr. Frey handled the sale of his crops each year. The record reflects that at the end of each crop year Mr. Bellard would consult with Mr. Frey concerning price, when to sell, etc. and would generally rely upon the advice tendered, allowing Mr. Frey to handle the sale of his crops.
Sometime prior to the year 1975, Continental Grain Company, a major exporter of soybeans, initiated a program for the sale of soybeans to it which is alternately referred *733 to in the record as a “price to be fixed contract” or the “Seventy Per Cent Program”. Under the program, the soybeans are sold by the farmer to Continental Grain Company, either directly or through an agent, and upon delivery of the soybeans, the farmer-seller receives seventy per cent of the market value of the beans on the date of delivery. Under the terms of the contract, the farmer-seller at this time selects a month in the future as the “trading date” for the final settlement and the ultimate price which the farmer-seller receives for the beans. The ultimate price is based on the future price quoted by the Chicago Board of Trade for the month selected. The farmer has the right to sell his beans at any time prior to the month picked by him as the “trading date”, however if sold prior to such date the price received is based upon the price quoted for the month picked as quoted on the Chicago Board of Trade on the date of sale. Mowata began to participate in the Continental program in the year 1974. The obvious advantage derived by the farmer in participating in this program is that he pays no storage and receives a cash advance of 70% at the time his beans are delivered.
At the end of the 1975 crop year Mr. Bellard informed Mr. Frey that he would like to get into the “Seventy Per Cent Program”. Mr. Frey testified that at that time he fully explained the program to Mr. Bel-lard. Mr. Bellard agreed in his testimony that the program was explained to him, however, he testified that he was never told that the ultimate price for final settlement was to be based upon the price quoted by the Chicago Board of Trade for a future month selected. Rather, Mr. Bellard testified that it was his understanding he could sell at any time prior to the date selected for the market price quoted on the date of sale. In any event, Mr. Bellard participated in the “Seventy Per Cent Program” in the year 1975, although Bellard testified that he was not too well pleased with the program in 1975, because he calculated that he lost about $3000.00, he did not mention any dissatisfaction to Mr. Frey.
In the year 1976 Mr. Bellard, together with his two sons, Charles and Jude, produced some 17,464 bushels of soybeans on lands owned by the plaintiffs named in the suit which bears our docket number 8222. Louis Bellard, acting individually and as agent for his two sons and the several landowner plaintiffs, contacted Mr. Frey and elected to commit the entire crop to the “Seventy Per Cent Program”.[1] The record appears to indicate some dispute as to whether or not Frey again explained the program to Mr. Bellard. The latter testified that the program was not again explained to him at this time. Frey was uncertain as to whether or not it was discussed in view of the fact that Bellard had participated in the program in the year 1975. Pursuant to Bellard’s request Mr. Frey negotiated a sale of the beans to Continental Grain Company with the month of September 1977 being picked as the “trading date”. Although it is not clear from the record, presumably the “trading date” was selected by Mr. Frey without consultation with Bellard. Mr. Frey testified that he selected the month of September because in his judgment, considering the market at the time of delivery, this would assure Mr. Bel-lard and associates the highest ultimate price.
Mr. Bellard testified that after the beans were committed to the program his group met and decided that they would sell when the bean market reached a price of $10.40 per bushel. He testified further that in March of 1977 he was discussing market conditions with an acquaintance who was also participating in the “70% Program”. This acquaintance suggested to him that although the bean market was approaching the $10.00 level he was tied to a September trading date which would bring a sales price of less than $10.00. The acquaintance suggested in conversation that very possibly Bellard was likewise tied to a future trad *734 ing date. Upon receiving this information Mr. Bellard testified that he contacted Mr. Frey and learned for the very first time that he was tied to a future month and would have to sell his beans based on September quotations. On the date he contacted Mr. Frey September beans were quoted at $8.40 per bushel. Mr. Bellard decided not to sell at $8.40 per bushel and thereafter made no effort to dispose of the beans from March to September and simply, as he stated, “let them take the beans over” on September 1st. The price on September 1st was $5.28 per bushel or $4.90 net after deduction of the standard discounts. In these consolidated matters the damages sued for and allegedly suffered is the difference between $5.28 and $10.40 per bushel on 17,464 bushels.
The trial court in dismissing the demands of plaintiffs in both suits stated:

“The court concludes that Mr. Bellard knew what he was doing and after March gambled rather than attempted (sic) to minimize his loss. He cannot now complain that his gamble was not fruitful.”

Plaintiffs in both suits appealed. We affirm.
The thrust of plaintiffs’ argument on appeal is that the program was never fully explained to Mr. Bellard and therefore the trial court erred in not awarding the total amount of damages sought. In the alternative, appellants urge, assuming correctness of the trial court’s finding that damages could have been minimized, that they should have been awarded judgment for the difference between $10.40 per bushel and the highest price paid for September beans during the year 1977.
Although we agree with the trial court that “Mr. Bellard knew what he was doing”, we prefer to base our decision to affirm on the ground that a perusal of the record clearly indicates that in committing Mr. Bellard’s 1976 crop to the “70% Program” with September as the “trading date”, Paul Frey acted in good faith and as the agent for all plaintiffs.
There is no question but that under our law an agency may be created verbally. Neiman-Marcus Co. v. Viser, 140 So.2d 762 (La.App. 2nd Cir. 1962), writ denied; Busby v. Walker, 84 So.2d 804 (La.App. 2nd Cir. 1955), writ denied; Nunn v. W. H. Kennedy & Sons, Inc., 308 So.2d 845 (La.App. 2nd Cir. 1975); LSA-C.C. Article 2992. In Nunn, supra, the court stated:

“There is no requirement that the authority to act as agent to sell a movable be in writing.”

The record reflects that Mr. Frey had much experience in marketing soybeans, having worked in that field for over 30 years. He was considered by most of the farmers in the area, including Mr. Bellard, as honest, sincere and extremely knowledgeable. Because of his expertise in the field of marketing, most of the farmers who did business with Mowata sought his advice and counsel on such matters as when to sell and what marketing programs would assure the ultimate gain on sale of their produce.
With particular regard to the relationship between Mr. Bellard and Mr. Frey, the record reflects that they were co-employees for over twelve years and that during such period Mr. Bellard relied on Mr. Frey to handle his crop sales each year. In the year previous to the controversial transaction Mr. Bellard, after consultation with Mr. Frey, authorized the latter to commit his entire crop to the “70% Program” and although at the time of trial he indicated some dissatisfaction with the result, he did not complain to Mr. Frey but rather again requested that Mr. Frey commit his entire 1976 crop to the same program. Under such circumstances we opine that Mr. Bel-lard constituted Mr. Frey as his agent to market his 1976 soybean crop.
The trial court did not resolve the apparent conflict in the testimony of Messrs. Bellard and Frey, i. e., whether or not the latter explained to the former that the ultimate price to be received for the sale was to be based on the future price quoted by the Chicago Board of Trade for the month selected, other than to state as aforementioned that “Mr. Bellard knew *735 what he was doing”. We do not consider it necessary that we resolve this conflict in the testimony for even if such explanation was not given and Mr. Frey, in the exercise of his judgment, supplied such date, he did so on behalf of Bellard in his capacity as agent. Although we do not resolve this conflict in the testimony, we observe that it would seem plausible that Mr. Bellard should have become aware of this contractual condition when his 1975 crop was marketed. If in fact Mr. Bellard did not become aware of this contractual condition until March of 1977, then presumably Mr. Frey selected the future “trading date” for the 1975 crop and upon receiving no complaint from Mr. Bellard upon consummation of that contract could reasonably assume that his agency extended to the selection of the “trading date”.
LSA-C.C. Article 3000 provides:

“Powers granted to persons, who exercise a profession, or fulfill certain functions, or do any business in the ordinary course of affairs to which they are devoted, need not be specified, but are inferred from the functions which these mandataries exercise.”

Volume 3 Am.Jur. 2nd, Agency Sec. 206 states in pertinent part:
“ Where the instructions are clear, precise, and imperative, they should be followed strictly and exactly . .. Nor should the principal’s instructions be construed as intended to be obligatory, unless they are distinct, positive, and express; an agent should not be held liable for a departure from the will of his principal where his orders are ambiguous, doubtful, or not explicit.”
Our brethren of the Fourth Circuit made reference to the above quotation from American Jurisprudence 2nd in Toranto v. Morton’s Auction Exchange Inc., 292 So.2d 767 (La.App. 4th Cir. 1974) stating:

“Defendant’s instructions obviously were not that explicit. Plaintiff’s error then, if any, could only be one of judgment. Such errors in good faith of an agent who contracts to perform personal services cannot serve as a basis for recovery against that agent. As pointed out in 3 Am.Jur.2d Agency Sections 204 and 205, an agent who has particular skills and talents in a certain field must exercise the care and skill expected of one in that field ‘But even an agent with purported special skills is not an insurer of his work and he will not be responsible for a mere error in judgment where he exercised the due care and appropriate skill of his profession’.”

In sum we conclude that plaintiffs-appellants, through Louis Bellard, constituted Paul Frey as their agent to market their 1976 crop through the Continental Grain Company’s “70% Program”, with authority to exercise his best judgment in the selection of a future “trading date”. There being no evidence that Paul Frey failed to use due care and skill in the execution of such mandate, the trial court correctly dismissed the plaintiffs’ demands at their costs.
For the above and foregoing reasons the judgment appealed from is affirmed at appellants’ cost.
AFFIRMED.

. It is not disputed that Mr. Bellard was fully authorized by his sons, Charles and Jude, and the landowner plaintiffs, to negotiate a sale of the beans for the account of all interested parties.